```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

INTERESTED LLOYD'S UNDERWRITERS,
Subscribing to Policy Number 1M8338602
as subrogee of THOMAS H. SEGAL, INC.
and/or THOMAS H. SEGAL,

                    Plaintiff,
                                              04 Civ. 4381 (RWS)
     - against -
                                              O P I N I O N
LARRY ROSS, MULTI MEDIA VISUAL ART,
INC. and JOHN DOE "1",

                    Defendants.
------------------------------------X
```

A P P E A R A N C E S:

    WHITE, FLEISCHNER & FINO
    Attorneys for Plaintiff
    140 Broadway
    New York, NY 10005
    By:  GIL M. COOGLER, ESQ.
        JONATHAN S. CHERNOW, ESQ.
        <u>Of Counsel</u>

    RABINOWITZ, BOUDIN, STANDARD, KRINSKY & LIEBERMAN
    Attorneys for Defendants
    740 Broadway, 5th Floor
    New York, NY 10003
    By:  ERIC M. LIEBERMAN, ESQ.
        CHRISTOPHER J. KLATELL, ESQ.
        MICHAEL LEE HERTZBERG, ESQ.
        <u>Of Counsel</u>

10/31/05

Sweet, D.J.,

Defendants Larry Ross ("Ross") and Multi Media Visual Art, Inc. ("Multi Media") have moved under Rule 12(b), Fed. R. Civ. P., to dismiss the amended complaint ("AC") of plaintiff Interested Lloyd's Underwriters ("Lloyd's") as subrogee of Thomas H. Segal, Inc. and Thomas H. Segal (collectively, "Segal"). For the reasons set forth below, the motion is granted in part and denied in part.

The parties seek an analysis of the relationships and rights surrounding the transfer in 2000 of an oil painting by Claude Monet, <u>L'Eglise de Jeufosse, Tempe de Neige</u> (the "Painting"), the present location of which appears to be unknown. Three art dealers and the indemnitor of one of these are involved in the fallout of an apparent fraud involving the Painting. Both parties to the instant motion have submitted factual material beyond the allegations of the AC. The resolution of the issues presented in the context of a Rule 12(b) motion is a challenging task.

**Prior Proceedings**

Lloyd's filed a complaint on June 9, 2004, naming Ross, Multi Media, Ross's two children, his former wife, and Le Chateau Fine Arts & Antiques, Inc. ("Le Chateau") as defendants. After communication between counsel, the children, the ex-wife, and Le Chateau were dismissed voluntarily on October 18, 2004. The

1

complaint alleged that Segal received the Painting in October 2000 and that Ross and Multi Media did not possess it until November 2000.

On November 15, 2004, Lloyd's filed the AC alleging six causes of action, claiming conversion by Ross and Multi Media (AC ¶¶ 57-66) and seeking: (1) a declaratory judgment that a sale of the Painting to Ross was void and that Segal held good title (AC ¶¶ 36-45); (2) a declaratory judgment that Ross and Multi Media did not purchase the Painting in good faith as a buyer in the ordinary course, and that Segal held good title (AC ¶¶ 46-56); (3) a declaratory judgment that the Painting was stolen and that only Lloyd's as Segal's subrogee has good title (AC ¶¶ 67-70); (4) a declaratory judgment that the Painting was stolen and Lloyd's is entitled to recover it from John Doe "1" (AC ¶¶ 71-74); and (5) replevin to recover the Painting from John Doe "1" (AC ¶¶ 75-78).

The instant motion to dismiss was heard and marked fully submitted on June 8, 2005.

**The Facts**

The facts are set forth in the AC and are accepted as true together with the exhibits annexed to the AC.

Lloyd's is a foreign unincorporated association with a principal place of business in London, England (AC ¶ 1), which insured Segal for the period from May 5, 2000 to May 5, 2001. (AC ¶ 2). On June 21, 2002, Segal subrogated his rights to the Painting to Lloyd's in exchange for valuable consideration. (AC ¶ 33).

Segal is an art dealer and has a gallery in Baltimore, Maryland. (AC ¶ 3). Ross is an art dealer and has a business in Palm Beach Gardens, Florida. (AC ¶ 4). Multi Media does business in New York and Nevada and is controlled by Ross. (AC ¶ 5). John Doe "1" is unknown to Lloyd's but is known to Ross and Multi Media. (AC ¶ 6).

On May 31, 2000, Michael Cohen ("Cohen"), an art broker, middleman, and runner entered into an agreement with Multi Media by way of an invoice covering the sale of the Painting for $3,150,000, stating that "title passes upon payment in full." (AC ¶ 10, Ex. A). On June 7, 2000, Multi Media by wire transfer to Cohen paid $3.1 million for the Painting. (AC ¶ 11, Ex. B).

On September 18, 2000, Cohen and Segal entered into an arrangement (the "Arrangement") upon which Lloyd's relies to establish Segal's title to the Painting. (AC ¶ 14, Ex. C). The Arrangement stated that Segal would provide $3.1 million and Cohen $400,000 for the Painting, which would be shipped from Japan if

3

payment was received and cleared. The Arrangement provided further:

> The cost of the painting is $3.5 million: Cohen has sold the painting for $3.8 million, with his receiving a commission of $100,000. Segal will receive $200,000 commission. The payment of $3.3 million to Segal ($3.8 - 400,000 deposit - $100,000 commission = $3.3 million) is due immediately upon presentation of the painting, but no later than October 26, 2000.

The Arrangement provided for collateral to be supplied by Cohen and given to Segal to be returned upon the payment of the $3.3 million. It also provided that: "In the event Cohen's client fails to purchase the painting Monet <u>Eglise</u> then the painting will be sold to another client" (AC, Ex. C) with Cohen to bear any losses. Upon completion of the sale, Cohen was to pay Segal $300,000 on the purchase of Monet's <u>Monte Carlo</u>, no later than October 26, 2000. (AC, Ex. C).

On September 18th and 19th, the Painting was invoiced from Japan to IDAS America Ltd. (AC, Ex. D) which in turn invoiced the Painting to the Thomas Segal Gallery. (AC, ¶ 16, Ex. E).

On September 19, 2000, Segal wired $3.4 to IDAS America and received $400,000 from Cohen. (AC ¶ 17). By fax Segal instructed Lebron Brothers to receive a painting from Japan and to place it in his space at Cirker's Hayes Storage Warehouse, Inc. ("Cirker's Hayes"). (AC ¶ 18, Ex. G). Cohen advised Segal that he

4

had a potential buyer who wanted to view the Painting at his home, and Segal agreed to release the Painting for that purpose. (AC ¶ 19). On September 26, 2000, the Painting arrived at John F. Kennedy Airport ("JFK") (AC ¶ 23). Segal advised Lebron Brothers to "deliver the painting to Michael Cohen, per his instructions" (AC, Ex. L) and confirmed these instructions to Cohen. (AC ¶ 25). The Painting was delivered to Cirker's Hayes for Cohen on September 27, 2000. (AC ¶ 26, Ex. N).

The same day the Painting was delivered to Day & Meyer, Murray & Young Corp. ("Day & Meyer") for the account of Ross. (AC Ex. O). Cohen did not return the Painting to Segal despite Segal's demand. (AC ¶ 29).

On February 8, 2001, the press reported that in December, Sotheby's threatened to sue Cohen on loans made to him to purchase paintings, that it initiated suit in California on January 22, and that it was reported on Forbes.com that Cohen had fled to Cuba. (AC, Ex. Q). The same day the Painting was removed from the Day & Meyer warehouse where it was held for the account of Ross, "ex. our warehouse for pickup by Grosso." (AC ¶ 31, ex. R). On April 21, 2001 the underwriters advised the Art Loss Register that the Painting was missing.

By affidavits submitted in support of its motion, Lloyd's submitted exhibits relating to criminal charges brought against

Ross, litigation against Ross relating to the acquisition of art, liens filed against Ross, corporate information concerning Multi Media, a warrant for the arrest of Cohen on charges of interstate transportation of stolen property and wire fraud issued on April 13, 2001, press reports of an arrest of Cohen in Brazil and his subsequent escape, an affidavit of Segal, the Settlement Agreement between Lloyd's and Segal, correspondence between counsel relating to exhibits, and a lease of an apartment to Dena Ross.

The AC thus alleges that Cohen failed to perform the Arrangement by not paying Segal $3.1 million by October 26, that Segal arranged for Cohen to obtain custody of the Painting, that Cohen arranged to have the Painting delivered to Ross, and that Ross had the Painting picked up by "Grosso" the day Cohen's flight was reported.

**The Rule 12(b)96) Standard On Choice Of Law**

On a Rule 12(b)(6) motion to dismiss, "consideration is limited to the factual allegations in plaintiff['s] amended complaint, which are accepted as true," and "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); see also Rothman v.

6

Gregor, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

Additionally, a 12(b)(6) motion to dismiss will be granted only where it is established that the plaintiff could prove no set of facts in support of his action that would entitle him to relief. McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004); Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001). The question is not whether the court believes plaintiff can prevail on his claims or at trial, but whether the plaintiff is entitled to offer evidence in support of its allegations. Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 264 (2d Cir. 2004). Further, courts will not grant motions to dismiss where discovery would better serve to develop facts and examine claims. Baker v. Cuomo, 58 F.3d 814, 818-19 (2d Cir. 1995).

Under New York's choice of law rules, "questions relating to the validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer." Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc., No. 98 Civ. 7664 (KMW), 1999 WL 673347, at *4, 1997 U.S. Dist. LEXIS 13257 (S.D.N.Y. Aug. 30, 1999); Kunstsammlungen Zu Weimar v. Elicofon, 536 F. Supp. 829, 845-46 (E.D.N.Y. 1981) (citing Wyatt v. Fulrath, 16 N.Y.2d 169, 264 N.Y.S.2d 233,

211 N.E.2d 637 (1965); Restatement (Second) of Conflict of Laws § 246 (1971)). Under the AC, all the activity relating to the transfer of the Painting after its shipment from Japan took place in New York. Accordingly, New York personal property law governs.

**The Motion To Dismiss The First And Second Causes Of Action Is Denied**

Both the first and second causes of action seek a declaratory judgment with respect to the title of the Painting. The first cause of action seeks to void the sale to Ross because at the time of the Cohen/Multi Media agreement, Cohen did not have title to the Painting (AC ¶¶ 38, 39), and he did not obtain possession until four months later. In the second cause of action the same facts are relied upon, together with the alleged facts concerning Cohen's reputation (AC ¶ 47) and the amount of the purchase price relative to the market value of the Painting (AC ¶ 52), which are alleged to deny to Ross and Multi Media the status of <u>bona fide</u> purchaser. Both causes of action seek a declaration that, under the facts alleged, Ross and Multi Media did not obtain title, and Segal did.

Whether Segal's participation in the financing of the purchase of the Painting, which resulted in its having been invoiced to him, earned for him title in the Painting is not established by the allegations of the AC's first and second causes of action which seek to void the transfer to Ross and Multi Media.

8

Whether Segal possessed an ownership interest in the Painting or served simply to finance the transaction and receive a commission is placed in issue by the language of the Arrangement that states that "Cohen and Segal agree to purchase the painting together" -- language which is in conflict with the remainder of the Arrangement, which describes a secured loan transaction. However that issue is resolved. According to Ross, Cohen was authorized to sell the Painting by the language of the Arrangement or as a joint venturer or agent of Segal. (Def. Memo in Support, pp 8-14). Since the purpose of the Arrangement was the sale of the Painting and since Segal released control over the Painting to Cohen for that purpose, Cohen was authorized to transfer the Painting under the allegations of the AC.

However, it is Lloyd's contention that the circumstances surrounding the transfer, Cohen's reputation, and the delay in turning over the Painting to Ross, deprive Ross of the status of a <u>bona fide</u> purchaser.

The allegations described above establish that Segal entrusted the Painting to Cohen, but Lloyd's has contended that Ross and Multi Media were neither buyers in ordinary course, nor good faith purchasers.

Ross has relied upon Subsection 2 of N.Y. U.C.C. § 2-403(2), which provides that: "Any entrusting of possession of goods

to a merchant who deals in goods of that kind gives him power to transfer all rights of the entrustor to a buyer in the ordinary course of business." Cantor v. Anderson, 639 F. Supp. 364, 368 (S.D.N.Y. 1986).[1]

Cohen, under the allegations of the AC, was an art merchant within the meaning of the N.Y. U.C.C. See N.Y. U.C.C. § 1-201(9) (merchant is "a person . . . in the business of selling goods of that kind"); Graffman v. Espel, No. 96 Civ. 8247 (SWK), 1998 WL 55371, at *4 (S.D.N.Y. 1998); (AC ¶ 10).

Unlike a thief, an entrustee has voidable, as opposed to void, title, and therefore can pass good title to a third party. See Graffman, 1998 WL 55371, at *6; N.Y. U.C.C. § 2-403 ("A person with voidable title has power to transfer a good title to a good faith purchaser for value."); Kaminsky v. Karmin, 187 A.D.2d 488, 489, 589 N.Y.S.2d 588, 590 (2d Dept. 1992) ("A bona fide purchaser for value may obtain a good title from one who has a voidable title"). Because he was an entrustee with voidable title, Cohen had power to transfer all of Segal's rights to "a buyer in the ordinary course of business." N.Y. U.C.C. § 2-403(2).

---

[1] The Uniform Commercial Code ("U.C.C.") is applicable to art as to other chattels. See, e.g., Morgold v. Keeler, 891 F. Supp. 1361, 1365 (N. D. Ca. 1995) ("The only regulation of art by statute is that governing chattels under the Uniform Commercial Code and its various state analogues.").

10

A buyer in the ordinary course of business, "means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights . . . of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind." N.Y. U.C.C. § 1-201(9). "'Good faith' means honesty in fact in the conduct or transaction concerned." Id.

Lloyd's has challenged Multi Media's standing as a "buyer in ordinary course of business," N.Y. U.C.C. § 2-403(2), on the grounds (1) that "Multi Media and Ross were experienced merchants in the art world," (AC ¶ 48), and that they therefore had "higher duties of good faith as merchants . . . to investigate the provenance" of the Painting (AC ¶ 48); and (2) that the 10% difference between the prices agreed to by Multi Media/Cohen in May and Segal/Cohen in September and the four-month period between Multi Media's purchase of the Painting and its arrival in New York, should have been a "warning sign" or "red flag" to indicate that something was wrong with the transaction. (AC ¶ 53).

Many lower courts have held that to be a purchaser in the ordinary course within the meaning of § 2-403 an art dealer must investigate the provenance of a work of art being purchased, even if the work is being purchased honestly and from a reputable dealer. See, e.g., Morgold, 891 F. Supp. at 1368 ("a dealer in art must take reasonable steps to inquire into the title to a paint-

ing"); Porter v. Wertz, 68 A.D.2d 141, 146, 416 N.Y.S.2d 254, 257-58 (1st Dep't 1979); Graffman, 1998 WL 55371, at *5; see also Cantor v. Anderson, 639 F. Supp. 364, 366 (S.D.N.Y. 1986). The New York Court of Appeals, however, declined to endorse this position in affirming the lower court's decision in Porter. Porter, 439 N.Y.S.2d at 107, 421 N.E.2d at 503; see Johnson & Johnson Products, Inc. v. Dal Intern. Trading Co., 798 F.2d 100, 104 (3d Cir. 1986) ("The New York Court of Appeals affirmed on the first ground [that entrustee was not merchant] and withheld opinion on the second [that purchase was not in ordinary course because of failure to inquire into title]"). Whether or not a duty of inquiry exists in New York in these circumstances is accordingly unclear.

Whether the delay of four months between contract and delivery and the differential between the purchase price and the market value of the Painting constitute a "red flag" to an art dealer appears to be a factual issue not to be resolved on this motion. The parties have cited no authorities on the subject.

The motion to dismiss the first and second causes of action as a matter of law is denied.

**The Conversion Cause Of Action Is Dismissed**

"To maintain a cause of action for conversion a plaintiff must establish legal ownership or an immediate superior right of

possession to a specific identifiable thing and that a defendant with intent to interfere with such ownership or possession exercised dominion or actually interfered with the property to the exclusion of or in defiance of the plaintiff's rights." Cantor, 639 F. Supp. at 369.

Here there are no allegations that Ross or Multi Media had an intent to interfere with Segal's rights. Indeed, there is no allegation that the Defendants were aware of Segal's involvement.

In addition, there is a three-year statute of limitations for a conversion action. Davidson v. Fasanella, 269 A.D. 2d 351, 352, 702 N.Y.S.2d 384, 385 (2d Dept. 2000) (citing CPLR 214).

In some art cases a requirement of demand and refusal is imposed before the limitations period begins to run apply. For instance, with respect to stolen art or art held by a bailee, a replevin or conversion action against the holder does not accrue until demand for return of the art has been made and refused. Hoelzer v. Stamford, 933 F.2d 1131, 1137 (2d Cir. 1991). In contrast to those cases, here Cohen knew that Multi Media had the Painting and that knowledge may be imputed to Segal and Lloyd's. Mallis v. Bankers Trust Co., 717 F.2d 683, 689 n.9 (2d Cir. 1983) ("It is a basic tenet of the law of agency that the knowledge of an agent, or for that matter a partner or joint venturer, is imputed

to the principal."). Moreover, the Defendants are not currently the holders of the Painting and are being sued not for replevin, but for conversion only. Thus there is no danger they will be able "to hold onto stolen art work" if the limitations period is deemed to have run. Cf. Solomon R. Guggenheim Foundation v. Lubell, 77 N.Y.2d 311, 320, 567 N.Y.S.2d 623, 569 N.E.2d 426 (1991).

Moreover, the AC has alleged that Segal did make demand against Cohen and was refused possession. (AC ¶ 29). Since Cohen is alleged to have fled the country in February 2001 (AC ¶ 30), such demand and refusal must have occurred before that date and the statute of limitations has run.

The applicable statute of limitations appears to have run on the claim of Segal. In the absence of intent to interfere on the part of Ross and Multi Media, the motion to dismiss the conversion action is granted.

### The Fourth And Fifth Causes Of Action Alleging Theft Are Dismissed

The exhibits to the AC establish, as set forth above, that Cohen's actions with respect to the transfer of the Painting were authorized by Segal. Of course, Cohen failed to perform the Arrangement to repay the loan, but the Arrangement by its terms contemplated the sale of the Painting by Cohen. On the allegations of the AC and the terms of the Arrangement, Cohen appears to have

misrepresented the sale price at which the Painting had been sold and failed to repay the loan and Segal's commission. Those circumstances do not constitute theft and Lloyd's has not submitted any authority to that effect.

**Jurisdiction Over Ross Is Adequately Alleged**

Lloyd's has alleged that Multi Media was, upon information and belief, owned and/or controlled by Ross (AC ¶ 5) and has submitted evidence beyond the AC to support its allegation.

Corporate records have been submitted to evidence that Multi Media is a shell in the name of Ross's father, Harry Ross, with its only asset being a car and no reportable business activity with an address in New York at 150 East 57th Street, Apartment 4D, which is on the Painting's sales invoice to Multi Media and which appears to be an apartment leased to Ross's daughter, Dena Ross. Deposition evidence also has indicated that Multi Media is an entity established by Ross to conduct his business as an art dealer. The "alter ego" issue is subject to proof rather than by a motion to dismiss. See Wm. Passalacqua Builders v. Resnick Developers S., 933 F.2d 131, 140 (2d Cir. 1991). See also Motown Records v. Mesh, No. 03 Civ. 7339 (PKC), 2004 U.S. Dist. LEXIS 3972 (S.D.N.Y. March 12, 2004) (finding that the plaintiff's complaint "adequately alleges facts that, if proven, would state a claim for alter ego under [the applicable] law.").

15

As to Ross's Florida residence, courts have found that "the exercise of personal jurisdiction over an alleged alter ego . . . requires application of a 'less onerous standard' than that necessary in equity to pierce the corporate veil . . . ." D. Klein & Son v. Good Decision, No. 04-1994, 2005 U.S. App. LEXIS 2764, at *3 (2d Cir. 2005); Volkswagenwerk AG v. Beech Aircraft Corp., 751 F.2d 117, 120 (2d Cir. 1984). In addition, according to the Day & Meyer receipt (AC Ex O), Ross acted in this transaction in New York by adding the Painting to his storage at Day & Meyer.

The motion to dismiss the complaint against Ross on jurisdictional grounds as a matter of law is denied at this time.

### The Motion To Dismiss Lloyd's For Lack Of Standing Is Denied

Lloyd's standing as subrogee of Segal has been alleged adequately. (AC ¶¶ 2, 33). On these pleadings there is no issue as to Cohen's default under the Arrangement or as to Segal's loss of his loan and commission. What is at issue as set forth above is the status of Ross and Multi Media as bona fide purchasers and whether or not the Defendants bear responsibility for the loss by Segal of whatever interest he had acquired under the Arrangement. As determined above, these issues are not susceptible for resolution as a matter of law on this motion.

As to Lloyd's standing as subrogee, the Defendants challenge the validity of subrogation agreement but recognize a triable issue in that regard. (Def. Memo in Support p. 24).

**Dismissal For Lack Of A Necessary Party Is Denied**

The AC seeks to void the agreement between Multi Media and Cohen with respect to the sale of the Painting. (AC ¶¶ 36-56). Because a plaintiff must join all parties to any contract sought to be set aside, this case cannot proceed in the absence of Cohen. See Crouse-Hinds Co. v. InterNorth, Inc., 634 F.2d 690, 701 (2d Cir. 1980) ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable.") (citation omitted); see also Global Discount Travel Services, LLC v. Trans World Airlines, 960 F. Supp. 701, 708-09 (S.D.N.Y. 1997).

In the ordinary circumstance, "complete relief cannot be accorded among those already parties" without the joinder of Cohen. Fed. R. Civ. P. 19(a)(1). This is a proposition with which Lloyd's is in accord. (Pltf. Memo in Opp. p. 21).

However, Lloyd's has contended that Cohen's joinder is not feasible under Rule 19(b), Fed. R. Civ. P., because he is not subject to service. Nowakowski v. Kohlberg et al., No. 89 Civ.

5621 (RWS), 1991 U.S. Dist. LEXIS 1705, at *7 (S.D.N.Y. February 12, 1991). Lloyd's has alleged that there were press reports on February 8, 2001 that Cohen fled the country (AC, Ex. Q). Lloyd's also has submitted evidence that a warrant for Cohen's arrest has been issued by the United States and that the press has reported that he has been arrested in Brazil on a fugitive warrant, escaped, and remains at liberty.

Despite the lack of direct evidence on this issue and the hearsay of what has been submitted, it does appear that joinder of Cohen at this time is not feasible.

If a necessary party cannot be joined, "the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed. R. Civ. P. 19(b). The exercise of the Court's discretion to dismiss under the test has not been satisfactorily established by the Defendants, given the "public stake in settling disputes by whole, whenever possible." Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 111, 88 S. Ct. 733, 19 L. Ed. 2d 936 (1968).

While noting that the test for determination of indispensability has four factors: (1) the degree of prejudice that might be caused the parties at bar by the missing party's absence; (2) the extent to which the court can lessen or dispel such

prejudice by exercise of its remedial or equitable powers; (3) whether an adequate judgment can be rendered in the missing person's absence; and (4) whether the plaintiff will have an adequate remedy upon dismissal. Fed. R. Civ. P. 19(b). No argument or authorities have been submitted by the Defendants to satisfy the "equity and good conscience" test. Under the circumstances, the motion to dismiss for lack of an indispensable party is denied with leave granted to renew upon appropriate grounds.

**Conclusion**

The motion to dismiss the first and second causes of action is denied, the motion to dismiss the third cause of action is granted, and the cause of action for conversion is dismissed. The motion to dismiss the fourth and fifth causes of action is granted and the cause of action for theft is dismissed. The motion to dismiss Ross for lack of jurisdiction is denied. Lloyd's is granted leave to replead within twenty (20) days.

It is so ordered.

**New York, NY**
October 25, 2005

ROBERT W. SWEET
U.S.D.J.